Murphy v. Beaumont Independent School District Oh, let's see, sorry, Mr. Monk? Yes, Your Honor. You may proceed. Thank you, Your Honor. Brandon Monk for Appellant Greg Murphy. I'd like to start out talking a little bit about the premium pay claim and the facts that support that claim, and then we'll move into malicious prosecution and First Amendment details and what the court wants to approach it in any other way, and I'm happy to answer any questions that the court has at any time, so thank you. So the premium pay policy that we focus on in the case is a policy that the district passed in August of 2019 before the pandemic took place. The nature of the policy is DEA local. It mandated premium pay under circumstances where employees were required to work during emergency closures, and so obviously with the pandemic, there was an emergency closure of the district. We refer in the record to these contemporaneous documents that the district is issuing, calling this an emergency closure. They use the phrase emergency closure. They use the phrase emergency closure. They use the phrase closure in particular as they're issuing memorandums online to update the public with respect to what's going on with the campuses and to let everybody know what to expect. So yes, they do use the word closure. In particular, it appears in a title in one of the memos that goes out, and so I focused on that in terms of trying to point to the record. No, I'm just trying to get at whether there's any disagreement over whether there was, in fact, an emergency closure within the meaning of the policy. The district, I think, contends that it was not an emergency closure. I think they'll argue to you that it was instead a period of modified operations, I think the term that they're going to try to use. There is factual disagreement about that. I think that we're here in a summary judgment context. We raise these issues about closure. I think that there may be something there that would be decided at the trial as to whether it was a closure or a period of modified operations. That's maybe more factual than it is legal. In your mind, is there a distinction within the meaning of the policy between that sort of modified operations versus emergency closure? I don't know. I don't know if there is. I don't really think so because factually the modified operations were to close the campus. You have these signs on all the schools that say that the campus is closed. The modified operation is just another term for a closure of the school, which is really what we think. I don't think that gets anywhere for the district in its defense of that. It's not important that we view it as an emergency closure in terms of whether or not the policy kicks in and they can make this premium pay? The determination about whether or not it's an emergency closure is inconsequential? No, I don't think it's inconsequential. I think it's important for the court to look at the fact that it was an emergency closure and that the only effort made to get out of that is really just a modification of the phrasing that they used to put on what was going on at the campus. I do think that the court, ultimately at trial, we would present evidence that this was a  closure. Mr. Murphy testified in his deposition that the campuses were closed and the school was  That is a focus and I do think it's relevant in terms of how the policy would be put in place as to Mr. Murphy's premium pay. The context of this also, we get some guidance from TASB that I think helps us about how this is all supposed to come together. TASB really recommends that the districts put this policy in place before they have to go request funds, for example, from the state or the federal government for reimbursement for these things and to avoid problems with the fact that if they didn't have the policy in place, that it could be looked at as a gift, which can be an illegal gift if they were to give the premium pay to try to entice these workers. TASB guided the district to put this in place in advance and they did that. I think probably at the time it was focused around events like hurricanes, which are more common, right? But in the phrasing, they don't specify hurricanes or the type of event that would trigger this. They use the word emergency closure. So that, again, becomes relevant in the discussion with the court. So Mr. Murphy's hired in 2019, January 2019. So he's subject to this policy at the time that he's hired. He's hired as a carpenter. And then we have the school closed March 23rd, 2020. I think the district admits he meets the non-exempt part of this. The other fight that the district gives us is about whether he was required to work. At times they contested, you know, maybe you didn't have to work, didn't have to show up, maybe it wasn't mandatory that you work. So we do address the board meetings specifically where Dr. Allen uses the phrase, have to work, with respect to the cafeteria workers and the maintenance workers to show that it really was not a choice. That, you know, at the board meeting there's discussion really that the board is very interested that Dr. Allen, if she's given these emergency powers, that she will continue to pay the  They are very concerned that they will lose workers. And much of these powers are geared towards giving her the ability to maintain the work staff and the board seeks reassurance before they give the emergency power that her intention is to keep these folks paid, working, and that they would get, you know, what they were supposed to get. And there's commitment to that by Dr. Allen at the board meeting and she's given, you know, these powers. Those powers, I think, come on March 24th, 2020 or shortly thereafter. That's the board meeting where it's discussed. And it's around that same time that we start to get those updates to the public about, you know, what we're doing. That's in the record at 477. So, Mr. Murphy goes on and works during the closure. He then receives word. Of course, he's not paid. You know, and he starts to recognize that he's not receiving this emergency pay. And there's some language that comes out of the district that is from Dr. Allen that is not necessarily a change to be local. It's not announced as that. But that the criteria that she's going to use as to who to pay the premium paid to is different than the criteria that was in the policy. And she announces something along the lines of, I think, consistent, prolonged exposure to the public is what she's going to use as the criteria instead. In effect, announcing her own policy. Right, right. I guess, so this sounds like this goes to the Monell claim because we're talking about a policymaker, a policy. Help me understand. Why did the district court grant a summary judgment on the Monell claim, right, against you? Correct. Why do you say that was incorrect? So, with respect to premium pay, is that where you're focused? Well, I just want to understand. I mean, there's a number of claims. So, the district court says no Monell claim. Why did the district court say no Monell claim? With respect to the First Amendment retaliation claim, the court was focused on. Well, I mean, with respect to, I'm sorry, you're right. I should have specified. With respect to the premium pay issue, he's not getting what the policy would give him for overtime pay. She, I think, really focuses on that this discretion is given to Dr. Allen and the power that the board gives. So, she has discretion to sort of nuance the policy. That's the contention, is that she was given that. That's disputed from our side. I think the clear language of that is important to analyze and that resolution. You would say she couldn't have been given discretion to nuance the policy. That's correct. She couldn't have been given that discretion. And further, if she was going to do something different than that, I think they'd have to give her the specific discretion to change the policy. And there'd have to be a procedure for that. And we didn't have any of that in advance of this working and earning the money. And so, it's more what she's doing is trying to explain after the fact why she's not made this pay. And I think that's where it becomes a particularly sensitive issue in terms of First Amendment as well. You know, because Mr. Murphy wants to go to the board and he wants to talk to them about the fact that this money should be there. It should have been allocated from the government. You should have reimbursed this money as a result of your policy. And we want you to know that we have not paid that. And he's really focused on a group of black maintenance workers and he circulates a petition associated with that. And that brings it to Dermot Samuels, who's HR at the district. And Dermot Samuels tells Mr. Murphy that he's going to bring it directly to Dr. Allen. And that's how we get into that there is an issue. And the child court actually found that Dr. Allen was a policymaker as to the premium pay claim. But then differentiated and distinguished on the First Amendment claim and found that she was not a policymaker in that area. But, you know, the fact that she didn't receive the petition, she was aware of it and that she's in control of the police department and HR throughout all of this is how we think that we get there on the First Amendment aspect as well. So Dr. Allen chooses to pay law enforcement. She pays cafeteria workers. She does not pay this group of black maintenance workers. The petition goes on. There's a class action grievance that's filed. Mr. Murphy's not the first named class part of that. But he, after the class agreement settles, they offer $819 approximately to these individuals. Some accept, some do not accept. Murphy is in the group that does not accept. And there is a letter that comes out from the district where it's clear that Mr. Murphy is seeking to speak to the board. And in the record at 719, the district writes in and says that you cannot address the board. Even though that would be the ordinary step on the level for grievance, we're going to consider that they settled it and that you cannot go on and present. And I think that indicates what they were looking to keep chilled in terms of the speech that would have gotten out there at that board meeting. And it also tells you what Mr. Murphy was looking to address in terms of this broader public concern, which we have to get to in order to make the First Amendment claim. The following events are accusations as to Mr. Murphy's conduct on the job. There's a timeline where they do some things like accusing him of taking too much time to put together media cards. No other employee had put them together. He was the only one assigned to do this. They didn't have a frame of reference other than the manual as to how much time he should take. And they said, well, he didn't do it fast enough. And he did contest that. They did try to get him through some discipline associated with the purchase of some riding gloves. They look into that. He contested. They look into it after he contested. And they find out that these riding gloves were really just a misprint on a receipt. And it was something that he wouldn't even have for his work. So they sort of go through those things. And he has these issues with the supervisor that stem shortly after he's looking to continue to present his grievance. And then they don't manage to get him terminated on those things. Mr. Murphy is working with a union representative, Mr. Hector Morales, who handles his grievance. He's talking about maybe bringing them in to help with this larger complaint. And then he's also putting together a lawsuit to file. And it's a class lawsuit. And that's how this case begins. It's a class claim only on the premium pay. After those incidents and the employment excuse, there's an attempt then to accuse him of terrorist threats in the break room. And it's a very flimsy accusation based on a statement really of one person, not part of the conversation, claims to have heard something in passing, but then makes it to the supervisor, Alan, who he's already having these issues with. Alan reports it to the police.  Yes, sir. Mr. Mock, do you have a due process claim? We do have a due process one, yes. All right. I want to talk about that for a minute. With regard to the due process claim, there's an amount that was offered to Mr. Murphy. Is that right? Correct. A settlement amount? About $819, yes. What's the difference between what you contend he's entitled to and what they offer? It's a figure over $4,000 that he's claiming he's entitled to. The period goes from March to May. The difference between $819 and approximately $4,000. All right. And then with regard to the due process claim, what due process do you contend he was denied? Well, he was not told that there was going to be a change in the policy or that he would be treated differently under the policy until after the fact. So it's only an ad hoc interpretation of this. He could have been told, hey, this policy is not going to pay me. He could have been told that so that he could choose not to work if he wasn't going to get paid the premium pay. And then further, the fact that the policy was mandatory. And the mandatory policy created the property interest. There was no real discretion that Dr. Allen had with respect to this policy. It simply should have been paid. And that takes us out really out of qualified immunity because there is no discretion here for Dr. Allen. It just simply should have been paid. She's in charge of the policy and she's a policymaker on it. So that's how the due process claims is. It's grounded on your idea that there's a property interest in the policy.  The pay, specific pay, that's the, as I understand it, that's the grounding of the due process. That's correct. The mandatory nature of that policy creates the property interest. And in the case, I think it's Kentucky Department of Corrections in terms of referring to that property interest. That's right. We also have a malicious prosecution claim. That issue is interesting in that we have this affidavit from the arresting officer. And the arresting officer then has a conscience-clearing moment and decides to say that this was not probable cause. The trial court did not consider two paragraphs of that. I think we argued that there were influences there that were very significant that the court could have made and in summary judgment really should have made and did not. Okay. And then the First Amendment claim is it involves these complicated issues of policymaker in content form and context of those statements with the facts that I think I've talked about. Okay. Well, you've saved time for rebuttal, Mr. Monk. Thank you. Thank you. Mr. Lamp? May it please the court, my name is Paul Lamp. And together with my law partner, Melissa Goins, we represent Appellees, Beaumont Independent School District, and Dr. Shannon Allen. Since this case was dismissed on summary judgment, I want to briefly just focus on what was in the summary judgment record and what wasn't in the summary judgment record. In BISD's motion for summary judgment, we offered several declarations from numerous witnesses, including Dr. Allen, the superintendent, the head of HR, an HR manager, the supervisor over the maintenance department where Mr. Murphy worked. We also offered excerpts from Mr. Murphy's deposition and the probable cause affidavit that led to his arrest. In response, Mr. Murphy's summary judgment evidence included a couple of documents from his criminal proceeding for the terroristic threat allegation, excerpts from his own deposition transcript, and then an affidavit from the same officer who issued the probable cause affidavit, except this affidavit he signed two years later and he had suddenly a very different version of events than what was in his probable cause affidavit. But there's no deposition testimony other than that. There's no other declarations other than that. So unless it appears in his deposition excerpts, all of these declarations from Dr. Allen, the HR manager, HR supervisor, all of those are incontrovertible. I think that's important for this court to consider when going into the merits of these claims, which as we know, there are three constitutional claims, First Amendment retaliation, Fourth Amendment malicious prosecution, and due process claims under the Fourteenth Amendment. So just focusing on the due process claim, I'm focused on the property interest, the alleged property interest in the policy, the pay, overtime pay policy, whatever we're calling it. Absolutely. Do you agree that that is a policy of the district for purposes of Monell? It is. Okay. It is a policy. All right. So why doesn't it create a property interest since it is phrased in mandatory terms? Well, it doesn't create a property interest for Mr. Murphy in this case.  Because the plain language of the policy says that during periods of emergency closure due to a disaster declared by a Federal, State, or local government. Okay. So this is what I asked initially to Mr. Monk. Are you saying that there's no – the summary judgment evidence doesn't even create a fact issue, a dispute of material fact as to whether there was an emergency closure with the amendment of the policy? That's correct. Tell me why is that? What's your argument? That's correct. Because, again, Dr. Allen's declaration is uncontroverted in the record. Okay. And she says in her declaration, this was not a period of emergency closure. She said this – and I think we need to step back and look at the board's resolution where it delegated authority to her. Okay. Over these times. You agree that there – so you agree she was a delegated policymaker? Yes. Okay. All right. Yes. And if we look at her declaration, and it's very clear, she says that – or the board says it's declaring authority to her for all purposes, for purposes of that policy and compensating employees during this period of time of emergency closure or modified operations. And as we all know, war is in the disjunctive, and it means that there are two different paths. Where does the argument come from that she did not have authority to change the terms of the premium pay? Yes, sir. I heard opposing counsel make that argument, but the delegation, the resolution that's in the record, again, has this language that says the board delegates to the superintendent the authority to stand in the place of the board and make all decisions regarding compensation during that period where COVID-19 was rapidly escalating through the country. So I think the district court got it right. She was a delegated policymaker. Now, you're not arguing that she would have the delegated authority to change the pay provisions of the policy if, in fact, there was an emergency closure. Like, she couldn't say, well, we'll pay some people this rate but not others. Only if she would have independently changed the policy. You can't delegate that. She didn't do that. No. Okay, what did she do then? What she did is she, according to the plain language of the policy, which requires an emergency closure, in her declaration, she clearly distinguishes that and says this was not, this COVID pandemic and how it affected the district, did not result in an emergency closure of the school district. For example, when the school district has suffered these horrendous hurricanes and tropical storms, literally the school district's operations shut down because people can't go to work and it's not safe to go to work. Here, COVID-19 was materially different. It's not that the facilities weren't accessible or they were dangerous in and of themselves. School operations continued. And that's where the phrase, and in the board resolution, it says four period of modified operations. So here, for example, and very importantly, in her declaration, she says all employees were still required to work during this time. And what she decided as the de facto policy maker for compensation during that time is number one, this is not an emergency closure. We are operating our business in a different way. We are delivering instruction to students in a different way. We're delivering meals to our students and their families during this time. This is not a closure. They are fully operating under very different circumstances. And frankly, the best they could under the circumstances. But doesn't the premium pay policy explicitly require that some operations take place? Isn't that required in the policy? No, the premium pay policy says during a period of emergency closure. But yes, if some people are directed to work during an emergency closure, they're going to get premium pay. Well, you can't, the premium pay policy can't kick in unless some operations take place.  And otherwise, who are you paying? That's right. Unless some non-exempt employees are working. So here's a perfect example, Justice Graves. During, you know, natural disasters, hurricanes, tropical depressions, certainly the district's law enforcement personnel, whether it's a skeleton crew or whatever the case may be, it is certainly reasonable that they're going to be patrolling and looking at the district's grounds and campuses. During that kind of closure, they're going to be entitled to premium pay under this policy. As well as any other non-exempt worker who would be required to work during that closure. But here, again, fundamentally different. Teachers were working. Food service employees were working. Mr. Murphy, as a carpenter, was working. Teachers, administrators, they just had to deliver these services in a different way. So it is fundamentally different than an emergency closure. Let me ask you this. Does the record reflect that under Ms. Allen's kind of, let's call it the, you know, modified operations policy, were there, she made a distinction between public-facing workers and non-public-facing workers, correct? Something like that. Yeah, where workers had to directly interact. Right. Were those, under her policy, modified operations policy, let's call it, were those workers guaranteed the same kind of premium pay as if there were an emergency closure? Yes. Okay, meaning it was the same formula, whatever it was. Yes, time and after. Okay. So let me get your reaction to this. Why wouldn't we rule that there is a material fact issue as to whether there was an emergency closure under the meaning of the policy? Because, as the district court found, school districts have the ability and the right to determine and interpret their own policy. Yeah. And here, that's what happened. It's not enough for an employee or a member of the public or anyone to say, hey, school district, I think you're interpreting this word wrong. Here, the school district has that discretion and decadence to interpret it. What's your best authority for that proposition? It's the case that the district court cited, and it's a Texas Supreme Court case. I did look for Fifth Circuit cases. There were three cases that cited it, not for that exact proposition. But I've got it in my notes, and the district court cited it. Well, I remember I wrote a case called James. Go ahead. Sorry. Sorry, Judge Brewer. Yes. I was just going to ask, is it Davis v. Moore? Is that the case you're talking about? Davis v. Moore? No. It involved a school district ISD in the name of the case. All right. But in that case, and if we truly drill down, there's the Texas Commissioner of Education, being the highest-ranking education official in the state, issues these administrative decisions. And there are scores of those decisions that say school districts are the interpreters, the final interpreters, of their own local policies. And so I do want to focus on that. This was a local policy, meaning the school district created it for its own purposes, a customized policy. Is the idea. So I don't think you would agree, correct me if I'm wrong, that a school district has the authority to modify a written policy and say, emergency closure. We declare an emergency closure. Let's say there's a hurricane. We're going to order some people to go back to work, but we're not going to pay you what the policy says because we've modified the policy. They don't have that authority, do they? That discretion. All right. But you say when they had modified the policy, the school board could always, in fact, at this meeting where it passed a resolution, it could have considered and modified that policy at that meeting by a majority vote. Sure. Sure. That didn't happen, though, right? This was a delegation. It didn't. And so unless we're talking about that kind of situation, you're right. They passed a policy. The words are in place. And unless they modify it, it needs to be enforced in that way. So I don't know if that exhausts the issue, but I do think it's important to note that, you know, I don't think anyone and certainly no one has questioned that her decision to draw a distinction in this period of modified operations to say, I'm going to authorize time and a half for those employees who, as you say, had direct interface with the public. They're entitled to time and a half, but others who do not have that interface. Well, it sounds like it's a COVID policy, right? Absolutely. That's why there's the public facing aspect of it. Absolutely. It's a risk. It's an incentive for the risk of the employee to have that direct interface with the public to earn that time and a half. Let me go to my notes real quick, Your Honor, just to ensure that. Oh, and therefore, so the district court thoroughly analyzed all this. And she said, and it's true. In the briefing, Murphy never, he just said, look, this is an emergency closure, but there was never even an acknowledgement of the disjunctive phrase or period of modified operations. The argument in the brief in the Fifth Circuit is simply, well, this is their ability to kind of shore up that argument. They're making it up as they go. But that's not evidence to dispute that this superintendent made that decision and that this superintendent determined that this was not an emergency closure. I remember what I wanted to ask. Mr. Monk referenced record materials. I think he said a memo that went out, assumed from the district, that used the phrase emergency closure. What's your response to that? Yeah, that's false. The district court particularly, and if you haven't read her decision denying the motion for a new trial, I encourage you to do so, because many of the arguments in the Fifth Circuit brief are specifically and thoroughly addressed by her quite stinging opinion. But she noted that, number one, the response to that, number one, is that's not in the summary judgment record. And so it's not even properly before the court. Number two, she analyzed that, and she said, well, I see these documents elsewhere in the record and nowhere in those communications to the public did the superintendent use the phrase emergency closure. She used the phrase closure but not emergency. So that's false. So kind of rounding out that due process claim, because there was no protected property interest that Mr. Murphy held, there could not have been the deprivation or a procedural due process violation without a protected property interest in the first place. I can quickly address the First and Fourth Amendment claims. As to the First Amendment claim, the district court correctly found that there was no policy or custom that led to any deprivation of Mr. Murphy's First Amendment rights. The argument in the district court, and I believe on appeal, was that somehow Dr. Allen, the superintendent, was the policymaker for that claim. And there's simply no evidence in the record that she was a policymaker for that. It's well established that school districts or the final school boards are the final policymaker for school districts unless that authority has been delegated. But it was not with respect to any First Amendment claim that Mr. Murphy brought. There are additional grounds, should the court need to reach that, by which the First Amendment claim could be affirmed with dismissal on appeal, and that is that Mr. Murphy was required to show but-for causation in order to create a fact issue as to but-for causation, and he failed to do that. The evidence in the record shows that there was a witness who reported that Mr. Murphy made a threat in front of other employees that he was going to use a remote-controlled car, strap a bomb to it, and blow up the maintenance building. Well, that certainly is not protected speech, and the only evidence in the record is that the HR manager or executive director of HR, Derwin Samuels, considered that information and determined that that was a terminable offense, along with the fact that Mr. Murphy was directed to be interviewed or submit a statement in response to those allegations, and he refused to do so. So the termination letter, which is in the record, shows two independent grounds for terminating him. So even if you get past the Monell issue on the First Amendment claim, he could not establish but-for causation in any of them. The Fourth Amendment malicious prosecution claim, I think, is easily dispatched. Again, the district court found there was no policymaker that Mr. Murphy pointed to that implemented a policy or custom to violate Mr. Murphy's Fourth Amendment rights. Again, he pointed to Dr. Allen, and there's no evidence in the record that Dr. Allen was a policymaker with respect to the Fourth Amendment claim. But again, even if you get past that Monell issue, there are other grounds to affirm the dismissal of that claim. Part of the malicious prosecution elements are that Mr. Murphy has to show a lack of probable cause leading to the malicious prosecution. And here, not only did we have an employee witness who submitted a statement that he heard Mr. Murphy make this terroristic threat, the arresting officer, we also have the probable cause affidavit in the record where the arresting officer says that, you know, he investigated the matter, there was evidence that Mr. Murphy made this statement in front of a crowd of people, and it caused fear amongst those employees. So under no circumstances could Mr. Murphy show a lack of probable cause leading to a malicious prosecution claim. And then finally, turning to Dr. Allen's qualified immunity defense, the district court correctly concluded that Dr. Allen was entitled to qualified immunity regarding the due process claims, turning back because she found that there was no protected property interest in the first place, and therefore Dr. Allen could not have unlawfully deprived Mr. Murphy of his Fourteenth Amendment rights. With respect to his First Amendment retaliation claim, Dr. Allen unequivocally states in her declaration that she didn't, that she was not involved in any way in any personnel decision, direct personnel decision involving Mr. Murphy. Any write-ups, his termination, she was not involved in any way, so she could not have retaliated against him under any circumstances. And finally, she testified in her affidavit that she wasn't involved in any way in his arrest or charge of the crime. So for all these reasons, appellees respectfully request that this court affirm the opinion and final judgment of the district court dismissing Mr. Murphy's claims of prejudice. Thank you, sir. Mr. Monk, you have five minutes for rebuttal. Thank you, Your Honor. May I proceed? Yes, please. I want to go directly to the statements related to the support in the record about emergency closure.  That is 477. It was attached to the Third Amendment complaint. Can you speak into the microphone? It was attached to the Third Amendment complaint at 477 in the record. 477. Is that the memo you were talking about? Correct. And the title specifically reads, update regarding district closure. Okay, so closure. And dated April 17, 2020, and signed by Shannon Allen. And the first sentence of that, it says, following the executive order of Governor Greg Abbott, Beaumont ISD has made the decision to suspend on-campus learning for the remainder of the 2019-2020 school year. So that's an expansive statement about even the teaching aspect of this is being suspended during this period. I'll go look at that, of course. Is there a reference in that communication to a sort of modified operations, a period of modified operations? Because Mr. Lamp is talking about sort of a nuance to Ms. Allen's policy that I hadn't really considered, emergency closure or a period of modified operations. What do you think about that? Yeah, so if the court looks at that exhibit closely, 477, there's another update from March 30, 2020, which I'll admit is referencing extended suspension of normal district operations at that time. Okay. That's subsequent to the memo? Before the memo. Before the memo. Right. Where is that? Same page. 477 in the record. What's the date on that? What's that page? 477. 477. Thank you. And so the way we read that all together is that there were modified operations that resulted in closure of the district. Okay. Those are not exclusive, right? And the district admits with this title, update regarding district closure, and I think that's important. All right. The area I'd like to go to next is related to the first amendment retaliation claim. I'd like to discuss in detail specifically the content form and context aspect of this analysis with respect to the speech that we focus on. We focus on the premium pay and the petition associated with that. So as we've mentioned, this dealt with allocation of public funds. He was seeking to speak to the board about this issue, and that was particularly sensitive in terms of the content. Policy was put in place to get funds from the government by way of reimbursement, and TASB had announced that, and that was particularly sensitive to the district, that they would have a policy to get funds, and then they would not use the funds for that premium pay. The workers that weren't paid were majority black maintenance workers, and that group that was organized was focused on the race of those maintenance workers when compared to the other classes, like cafeteria workers and law enforcement personnel. And so that content does make this speech as a matter of public concern is our focus. In terms of the form of the content, he was petitioning. He was obtaining signatures of other workers to present to the district. It was not just about his own personal issue. It was about the broader issue of fair pay for all the other workers associated, and there's mention in the grievance that all of that group fears retaliation from the district, that the union that's presenting that, even at the time of the earlier presentation, was concerned that the entire group would be retaliated against in their presentation. The class petition that he went on and filed shortly after his termination, he was terminated in February, and he files his lawsuit, I think, March of 22, with only the premium pay claim at that time, and he's asserting that right on behalf of all of those other workers as a class petition at that time. In terms of context, it's important to remember in the context of the global pandemic, discussion about closures and such as that is particularly sensitive, and it is in the public at that time. Discussion about essential workers is important at that time. Reference was made in the grievance that they were an essential worker and that they should be paid, and that puts that speech in this broader context of the conversation that was going on at the time of the pandemic. And then the speech related to racial equality in terms of who was paid is part of the analysis on that as well. So this speech does qualify as citizen speech, and then we contend that Allen was a policymaker. She controlled the department. She controlled HR. She was particularly sensitive because it was her that had made the decision about premium pay. She goes and links all that up, and that's where we end up. All right. Well, thank you, counsel, for a well-argued case. This matter is under submission, and that concludes our oral arguments for this week. Thank you. Thank you.